33 F.3d 774
 63 USLW 2150, 1994-2 Trade Cases P 70,695
 Joseph W. HAMMES, Trustee of the Estate in Bankruptcy of
Bonnie J. Cooksey and Claude W. Cooksey; and
Cooksey AAMCO, Incorporated, Plaintiffs-Appellants,
v.
AAMCO TRANSMISSIONS, INCORPORATED; Indianapolis, Indiana,
AAMCO Dealers' Advertising Pool; Marc Brittner;
et al., Defendants-Appellees.
 No. 93-3884.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 11, 1994.
Decided Aug. 24, 1994.
Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 20, 1994.
 
 Philip A. Whistler (argued), Curtis W. McCauley, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for plaintiff-appellant.
 Abraham C. Reich (argued), Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, Richard J. Darko, Susan P. Stuart, Lowe, Gray, Steele & Hoffman, Indianapolis, IN, Kevin A. Norris, AAMCO Transmissions, Inc., Corp. Counsel, Bala Cynwyd, PA, for AAMCO Transmissions, Inc.
 Bernard L. Pylitt, Jeffrey A. Hearn, Katzman, Katzman & Pylitt, Indianapolis, IN, for Indianapolis, Indiana, AAMCO Dealers' Advertising Pool, Marc Brittner, and Tom Schroeder, Darryl Dieg.
 John A. Kitley, Jr., Beech Grove, IN, for Chuck Kellermeyer.
 Before POSNER, Chief Judge, and CUDAHY and ROVNER, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 The plaintiffs appeal from a judgment that dismissed their antitrust suit on the surprising ground that the complaint had failed adequately to allege that the defendants' violations had affected interstate commerce. The defendants defend the judgment on other grounds as well, so we have a number of issues to resolve; but the most important is the issue of commerce, and it is entangled with a procedural issue: how detailed federal pleadings must be.
 
 
 2
 The complaint alleges the following facts. By reciting them we do not of course vouch for their truth, but they are all we have at this stage. Bonnie and Claude Cooksey were franchised by AAMCO Transmissions, Inc. (ATI) to operate an AAMCO transmission repair center in Indianapolis. To obtain the franchise they had been required by ATI to join the Indianapolis, Indiana, AAMCO Dealers' Advertising Pool, an unincorporated association that along with ATI and the dealers belonging to the pool is a defendant in this suit. The pool buys an advertisement in the yellow pages that lists the address and telephone number of each of the pool's members, who in the relevant period were five in number including the Cookseys' dealership, Cooksey AAMCO, Inc. It lists five other phone numbers with only a general indication of location (a neighborhood or other area in Indianapolis) rather than street addresses corresponding to these numbers. The reason for the omission of the street addresses is that these five "dealers" are phantoms--apparently nothing new in this industry. McAlpine v. AAMCO Automatic Transmissions, Inc., 461 F.Supp. 1232, 1263 (E.D.Mich.1978). A call to one of the five numbers is automatically forwarded, in accordance with a preexisting agreement, to one of the dealers in the pool--presumably, we were told at argument, one near the location designated in the advertisement for the "dealer" with the phantom number. Because the other members wanted to stifle the Cookseys' competition, the pool refused to include the Cooksey dealership in the call-forwarding network, and as a result no calls to phantom numbers were forwarded to Cooksey. Its phone number and address were listed in the advertisement, so it got some business that way, but, without any calls being forwarded from the phantom numbers, not enough to stay afloat. And when it tried to advertise outside the pool, it was enjoined at the suit of the other dealers for violating the pool agreement. So eventually Cooksey went belly-up. The injunction was issued in the course of a suit in state court that the defendants had brought against the Cookseys for failing to pay their share of the advertisement in the yellow pages. That suit was stayed when the Cookseys went into bankruptcy, so its merits have never been determined.
 
 
 3
 Since the Cookseys' dealership was operated in the corporate form, we do not understand why their trustee in bankruptcy is a plaintiff along with the corporation. Shareholders do not have standing to sue for harms to the corporation, or even for the derivative harm to themselves that might arise from a tort or other wrong to the corporation. Singletary v. Continental Illinois National Bank & Trust Co., 9 F.3d 1236, 1240 (7th Cir.1993); Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333, 1335 (7th Cir.1989); Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1378 (7th Cir.1987); cf. Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). There is no suggestion that the Cookseys incorporated during rather than before the alleged violations took place, in which event they would have sustained a direct injury to themselves as well as the derivative injury resulting from their ownership of the corporation. Although the complaint states that the corporation declared bankruptcy along with its owners, and has been liquidated, there is no mention of a trustee. Maybe the rights of the bankrupt estate were assigned to the Cookseys. But if so why would--how could--the corporation, liquidated without a trace as it were, be a plaintiff?
 
 
 4
 These are deep mysteries, but not ones we have to solve. The defendants do not question the Cookseys' standing, and, despite the suggestive terminology, "antitrust standing" is not a jurisdictional requirement and is therefore waivable. The issue is not whether the Cookseys were hurt by the injury to their corporation--no doubt they were, albeit obliquely, but that would be enough to confer standing in the Article III sense. It is whether they have a legal right to obtain damages for that hurt, North Shore Gas Co. v. EPA, 930 F.2d 1239, 1242 (7th Cir.1991), and that is a question about the merits. It has been waived, so we shall pay no further attention to it, except that in the balance of our opinion we shall pretend that there is one plaintiff and call it "Cooksey."
 
 
 5
 The complaint alleges that ATI sells franchises in several states and that pursuant to the franchise agreements Cooksey and the other AAMCO dealers in Indianapolis mailed substantial fees to ATI at its Pennsylvania headquarters, contributed money to ATI's national advertising, "and purchased equipment and inventory sold by ATI (or otherwise meeting ATI's specifications)," "all of which activities occurred in and had a substantial effect on interstate commerce." There are no allegations concerning the amount of equipment or inventory purchased or where the stuff came from. There are no numbers. Nor is it expressly alleged that the defendants' violations of the Sherman Act, as distinguished from the specific activities of the plaintiffs and the defendants that the complaint describes in the passages we have just quoted, activities none of which is unlawful, affected interstate commerce.
 
 
 6
 So what? The Federal Rules of Civil Procedure do not require the plaintiff to plead the particulars of his claim, Fed.R.Civ.P. 8(a)(1) with the exceptions (of which the best known is fraud) listed in Rule 9(b). Early v. Bankers Life & Casualty Co., 959 F.2d 75, 79 (1992). A nascent movement in the lower courts to add judge-made exceptions to those listed in Rule 9(b), well described in Boston & Maine Corp. v. Town of Hampton, 987 F.2d 855, 862-64 (1st Cir.1993), was scotched by the Supreme Court in Leatherman v. Tarrant County Narcotics Unit, --- U.S. ----, ----, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993); see also Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). We continue to be puzzled why lawyers insist on writing prolix complaints that can only get them into trouble, as in Conn v. GATX Terminals Corp., 18 F.3d 417, 419 (7th Cir.1994), and Fryman v. United States, 901 F.2d 79, 82 (7th Cir.1990).
 
 
 7
 But we have been speaking so far of the statement of the claim in the complaint and it may be necessary to distinguish between that and the jurisdictional allegations, even though the rules use the same formula, "short and plain statement," for both. Fed.R.Civ.P. 8(a)(1), (2). Jurisdiction is a threshold issue, normally not litigated at all; and the court has an independent duty to satisfy itself that it has subject-matter jurisdiction. Naturally, therefore, it relies on the complaint to say enough about jurisdiction to create some reasonable likelihood that the court is not about to hear a case that it is not supposed to have the power to hear. In a diversity case, for example, it is not enough for the plaintiff to allege that the claim is within the diversity jurisdiction; the complaint must allege the citizenship of the parties and the amount in controversy. Fed.R.Civ.P., Form 2(a); Hemmings v. Barian, 822 F.2d 688, 693 (7th Cir.1987).
 
 
 8
 But when the jurisdictional prerequisite is effect on interstate commerce, the pleading of a conclusion should be good enough, since the number of cases that fail at that threshold has become minuscule; "there are astonishingly few offenses to antitrust principles that do not 'affect commerce.' " Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application Sec. 232.1f, at p. 286 (1992 Supp.). At a time when the interstate character of certain restraints of trade in the health-care industry (namely those that involved the denial of staff privileges at one hospital for one doctor) was in doubt, more particularized allegations were necessary to assure the court that the plaintiff's claim satisfied the commerce requirement, as in Marrese v. Interqual, Inc., 748 F.2d 373, 379-83 (7th Cir.1984). That time is past. See Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991).
 
 
 9
 Section 1 of the Sherman Act, 15 U.S.C. Sec. 1, which the dealers' practice of allocating customers through the call-forwarding system is alleged to violate, forbids conspiracies in restraint of trade or commerce among the states or with foreign nations. It would therefore have been enough for the plaintiff to have alleged, without further particulars, that the defendants' conduct in excluding it from the call-forwarding feature of the advertising pool restrained (impeded, impaired, diminished--there is no magic word) interstate commerce. Though some cases state otherwise, the complaint would not have had to add that the restraint was substantial. No such limitation is stated in the Act. When the Act was passed back in 1890, a limitation to cases in which the defendant's conduct had a "direct" effect on interstate commerce (thus excluding all of manufacturing) was implicit because of the narrow construction that the Supreme Court had placed on the power of Congress to regulate such commerce. But the Act has been held to go to the limit of that power as expanded by interpretations of the Constitution in later decisions. Summit Health, Ltd. v. Pinhas, supra, 500 U.S. at 329 and n. 10, 111 S.Ct. at 1846 and n. 10; Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 743 n. 2, 96 S.Ct. 1848, 1852 n. 2, 48 L.Ed.2d 338 (1976); Fuentes v. South Hills Cardiology, 946 F.2d 196, 200 (3d Cir.1991). Congress's power over interstate commerce is now understood not to be limited to activities that substantially involve or affect such commerce. "The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small." NLRB v. Fainblatt, 306 U.S. 601, 606, 59 S.Ct. 668, 671-72, 83 L.Ed. 1014 (1939).
 
 
 10
 If the Sherman Act goes to the constitutional limit, an antitrust conspiracy that by raising the price of some good or service made in one state and sold in another reduced the quantity sold would be within the reach of the Act even if both the traffic affected, and the conspiracy's effect on that traffic, were small. Cf. Hospital Building Co. v. Trustees of Rex Hospital, supra, 425 U.S. at 745, 96 S.Ct. at 1852-53. We shall see that despite what the cases say, or rather what some of them say, it is not certain that the word "commerce" in the Sherman Act means exactly the same thing as "commerce" in Article I of the Constitution. But it is certain that they are very close, so that cases like Heille v. City of St. Paul, 671 F.2d 1134 (8th Cir.1982), holding that local rubbish collection is beyond the reach of the Sherman Act, clearly are outmoded.
 
 
 11
 Although all the complaint had to allege, therefore, was that the defendants had restrained interstate commerce, this was not the character of the allegation actually made. It was instead that certain activities of the dealers (including Cooksey), such as purchasing equipment and mailing fees, either occurred in or affected interstate commerce. But this allegation was sufficient to confer jurisdiction when read together with the substantive allegations of the complaint. Provided that some of the transmissions and parts purchased by Indianapolis AAMCO dealers from ATI come from other states--as the complaint alleges, and the defendants have not denied--a conspiracy among the dealers to exclude the plaintiff would have to restrain interstate commerce, the dealers being merely the last intermediary in an interstate transaction that ends with the purchase of a transmission or a part by the consumer. Cases almost too numerous to cite either find or, because the proposition is rarely questioned, assume on this basis that conspiracies among local sellers affect interstate commerce within the meaning of the Sherman Act. E.g., United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959); Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967) (per curiam); Hospital Building Co. v. Trustees of Rex Hospital, supra, 425 U.S. at 744, 96 S.Ct. at 1852; McLain v. Real Estate Board, 444 U.S. 232, 245, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980).
 
 
 12
 Even if Indiana were a vehicular autarky, so that all the parts that the AAMCO dealers install in the transmissions they repair and all the transmissions they sell as replacements of unrepairable transmissions were fabricated in Indiana, a conspiracy among the Indianapolis dealers to eliminate competition among themselves would restrain interstate commerce. For it would raise the price of automobile transportation, much of which is interstate, thereby reducing the amount of interstate transportation demanded and so supplied. The effect on interstate commerce would be small. No doubt it is small in this case. But it is not required to be large, or even measurable; there are sound practical reasons for this, as we shall see.
 
 
 13
 It is true that many cases, such as McLain v. Real Estate Board, supra, 444 U.S. at 242, 100 S.Ct. at 509, and Hospital Building Co. v. Trustees of Rex Hospital, supra, 425 U.S. at 743-44, 96 S.Ct. at 1851-52, say that the Sherman Act requires proof of a substantial, or at least a not insubstantial, effect on interstate commerce, either by the antitrust violation itself, or by the activities affected by the antitrust violation. But the cases do not indicate where the line between substantial and insubstantial lies, and their reference to substantiality is in tension with the cases which hold that the Sherman Act goes to the constitutional limit--and some of them are the same cases, such as Rex Hospital. It seems that the approach actually taken (as distinct from articulated) by a majority of the Justices "comes so close to covering virtually every restraint that the judicial formulae covering proof of jurisdiction seem mainly to complicate, confuse, and lengthen antitrust litigation without affecting the outcome. Simplification seems called for." Areeda & Hovenkamp, supra, Sec. 232.1a, at pp. 271-72. The authors opine that the "not insubstantial" formula of McLain "appears to state only a nominal requirement," id., Sec. 232.1a, at p. 271, but they consider the opinion as a whole ambiguous. Id., Sec. 232.1d, at p. 280; Sec. 232.1f, at p. 285.
 
 
 14
 So there is a deep tension in the cases between the go-to-the-constitutional-limit position and the must-prove-substantial-effect position, as well as a variety of uninformative and possibly inconsistent verbal tests (are "substantial" and "not insubstantial" the same or different?). Simplification is indeed overdue. One possibility would be to adopt an irrebuttable proposition that all violations of antitrust law affect commerce. This approach would be consistent with economic reality, because the United States has an integrated economy, but it is an approach that the Supreme Court has shied away from taking. Another possibility would be to deem beyond the reach of the Sherman Act those conspiracies and other offenses that have only a trivial effect on interstate commerce, provided (the significance of the proviso will become apparent shortly) that the entire class of cases represented by the case in question would also have only a trivial effect. If two children operating competing lemonade stands decided to fix prices, the effect on interstate commerce would be trivial; and even if an epidemic of price-fixing occurred among child operators of lemonade stands, the effect on the national economy would be slight. Although the exclusion of such cases from the Sherman Act's reach would be consistent with the outcomes and most of the language of the Supreme Court's decisions, Areeda and Hovenkamp warn that "a de minimis threshold ... would be hard to administer." Id., Sec. 232.1f, at p. 286. The principle de minimis non curat lex is applied in many areas of law, without undue mischief or inconvenience, Hessel v. O'Hearn, 977 F.2d 299, 302-04 (7th Cir.1992), but applied here it would invite arcane disputes over economic incidence and it would sit uncomfortably with the Court's repeated assertions that the Sherman Act goes to the constitutional limit. For there is no de minimis exception to the power of Congress to regulate commerce--though there is also no reason why the statute and the Constitution should be exactly coterminous. It is one thing for Congress to assert a plenary power over commerce, and another for it to require the courts to entertain cases involving trivial local disputes.
 
 
 15
 We need not attempt to resolve the question whether a de minimis exception to the otherwise unlimited scope of the Sherman Act with respect to interstate commerce should be recognized. It would not help the defendants in this case. For they argue, contrary to the conclusion we reached earlier, that a Sherman Act plaintiff must allege and prove not merely a nontrivial, but a large, effect on interstate commerce. They rely on two cases of ours, both involving the suspension of hospital privileges, Seglin v. Esau, 769 F.2d 1274 (7th Cir.1985), and Doe on behalf of Doe v. St. Joseph's Hospital, 788 F.2d 411, 417 (7th Cir.1986). The authority of these cases, and of the Ninth Circuit's decision in Mitchell v. Frank R. Howard Memorial Hospital, 853 F.2d 762, 764-66 (9th Cir.1988), a similar case, has been greatly undermined by subsequent decisions in medical antitrust cases, notably Summit Health, Ltd. v. Pinhas, supra, and our own Nelson v. Monroe Regional Medical Center, 925 F.2d 1555, 1566-67 (7th Cir.1991). The plaintiffs in Seglin, Doe, and Mitchell had shown merely that a defendant hospital was engaged in interstate commerce; and this was deemed insufficient to support an inference that the antitrust violations themselves had had any effect on commerce. The plaintiff in each case was a physician not alleged to be engaged in interstate commerce, and it was not apparent to the courts that decided these cases how suspending him would affect commerce in the slightest. The courts' puzzlement was understandable. But Summit Health, Ltd. v. Pinhas was the same kind of case--one doctor, dropped by one hospital--and the Supreme Court held that the commerce requirement was satisfied. 500 U.S. at 332-33, 111 S.Ct. at 1848-49. Our case is stronger for finding the requirement satisfied because the plaintiff, as well as the defendants, is alleged to be engaged in interstate commerce, so that it is manifest that a conspiracy aimed at driving the plaintiff out of business--and succeeding in that aim, as it is alleged to have done--would affect that commerce.
 
 
 16
 A particularly questionable feature of Seglin, explicitly rejected by the Supreme Court in Summit Health (see id. 500 U.S. at 331-32, 111 S.Ct. at 1848), is the attempt to evaluate impact on interstate commerce on the basis of the facts of an individual case, as distinct from the class of cases to which it belongs. Obviously if the entire health-care industry, or all of retail trade, were cartelized, the effect on interstate commerce would be profound. The prices and probably the costs as well of the services produced by these vast sectors of the economy would be higher and the output smaller, and these effects would reverberate throughout the economy. In an industry or sector, however immense, in which most units of production are small--and both health care and retail trade are such sectors--an insistence by the courts that each cartel be shown to have a demonstrable effect on interstate commerce would allow the entire industry to be cartelized, piecemeal, with impunity. Klor's, Inc. v. Broadway-Hale Stores, Inc., supra, 359 U.S. at 213, 79 S.Ct. at 710. The law does not require such a showing. "Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." Fry v. United States, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975).
 
 
 17
 The defendants could prevail on the issue of the adequacy of the complaint's allegations concerning interstate commerce only if such a complaint had to allege that running this plaintiff out of business would have a substantial impact on interstate commerce, or if the facts alleged in the complaint negated an inference that the defendants' conduct could affect interstate commerce, or if the plaintiff had to allege a connection between the mechanics of the conspiracy (here, the allocation of customers through phantom numbers) and interstate commerce, or if the complaint had explicitly to state that the defendants' conduct affected interstate commerce even though the effect could be inferred from other facts alleged (such as that the plaintiff was engaged in interstate commerce and the defendants drove it out of business). None of these things is required, and the defendants' argument therefore fails. It is quite enough, probably more than enough, if the complaint alleges that the plaintiff was engaged in interstate commerce and was injured by the alleged antitrust violation.
 
 
 18
 So the defendants lose on commerce; but they have several fall-back positions. The first is that the complaint does not state a claim of violation of section 1; at most it shows a deceptive practice. But the complaint's description of the defendants' practice is certainly consistent with an antitrust conspiracy, and no more is required at this stage, Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232-33, 81 L.Ed.2d 59 (1984); Hrubec v. National R.R. Passenger Corp., 981 F.2d 962, 963 (7th Cir.1992), for again we remind that a plaintiff is not required to plead the particulars of his claim. The inference of a heightened pleading requirement in antitrust cases that the court in Boston & Maine Corp. v. Town of Hampton, supra, 987 F.2d at 864, drew from our opinion in Sutliff, Inc. v. Donovan Companies, Inc., 727 F.2d 648, 654 (7th Cir.1984), cannot be considered authoritative after Leatherman. Properly understood, Sutliff is simply another of those cases in which the plaintiff pleaded himself out of court.
 
 
 19
 The most elementary prohibition of section 1 of the Sherman Act is that of conspiracies between competitors to fix prices, and the prohibition extends to conspiracies between dealers in the same brand, here AAMCO. A type of conspiracy that has effects almost identical to those of price-fixing and is treated the same by the law is a conspiracy between competitors to rotate or otherwise allocate customers among the conspirators, so that each customer faces a monopoly seller. The AAMCO dealers in Indianapolis are located in different parts of the city and each presumably has an advantage in competing for the customers nearest to it. Under conditions of unrestricted competition, customers on the borderline of these zones of advantage would be courted by two or more dealers. The allocation of these customers among the dealers by means of automatic call forwarding from phantom dealers supposedly located in the borderline areas could eliminate competition for customers who, not being within the gravitational field of any dealer by reason of proximity, would, were it not for the allocation, have a real and not merely theoretical choice between dealers. Such an out-and-out scheme of customer allocation would be a per se violation of section 1. Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam). Of course we do not yet know whether this is the character of the call-forwarding scheme; maybe the only purpose or effect is to deceive customers into thinking that there are more, and more conveniently located, AAMCO dealers than there are. But these are not issues that can be resolved on the pleadings.
 
 
 20
 The defendants' next fall-back argument is that Cooksey has not alleged antitrust injury--injury caused by the kind of conduct that the antitrust laws seek to prevent. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697-98, 50 L.Ed.2d 701 (1977); Jack Walters & Sons Corp. v. Morton Building, Inc., 737 F.2d 698, 708 (7th Cir.1984). More precisely, since a complaint need not go into such detail, their argument is that the allegations that the complaint does make, however unnecessarily, show that the plaintiff is not claiming antitrust injury and therefore has failed to state a good claim. This would be yet another example of pleading oneself out of court, the occupational hazard of authors of prolix complaints.
 
 
 21
 If the complaint showed that Cooksey's only gripe was that it had been expelled from a cartel and thereby deprived of cartel profits, it could not recover those lost profits as antitrust damages. The antitrust laws seek to prevent rather than to protect cartel profits; it would be a strange perversion to make antitrust law the vehicle for the enforcement of illegal anticompetitive agreements. That Cooksey is seeking lost cartel profits is only one possible interpretation of the complaint, however, and any ambiguities must be left to further proceedings to resolve. Another interpretation is that Cooksey wanted to compete by underselling the other dealers, thus weakening or breaking the cartel, and that it was ejected from the advertising pool in order to prevent it from, or punish it for, doing this. Losses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws, Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 258 (2d Cir.1989); Volvo North America Corp. v. Men's International Pro Tennis Council, 857 F.2d 55, 67-68 (2d Cir.1988); cf. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139-40, 88 S.Ct. 1981, 1984-85, 20 L.Ed.2d 982 (1968), for otherwise an effective deterrent to successful cartelization would be eliminated; and it is premature to conclude that this is not the character of the loss that Cooksey seeks to recover.
 
 
 22
 The defendants also defend the dismissal on the ground that the franchise agreement required Cooksey to arbitrate any disputes arising out of it. If the agreement--which required Cooksey to join the dealers' advertising pool--was itself an instrumentality of a cartel, then it might seem obvious that no part of it, including its arbitration clause, would be legally enforceable, even if we assume, following the Ninth Circuit's recent decision in Nghiem v. NEC Electronic, Inc., 25 F.3d 1437 (9th Cir.1994), that agreements to arbitrate domestic as well as international antitrust disputes are now enforceable. But analogy to Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404-06, 87 S.Ct. 1801, 1806-07, 18 L.Ed.2d 1270 (1967), which holds that an arbitration clause is enforceable even if the dispute is over whether the contract containing it was induced by fraud, suggests that an arbitration clause may be enforceable even if the dispute is over the validity under the antitrust laws of the contract containing the clause. Especially may it be enforceable where as in this case there is no suggestion that the party resisting invocation of the clause was coerced into accepting it or that the arbitrators are themselves a cat's paw of the cartel.
 
 
 23
 We need not resolve the issue of enforceability. Cooksey did demand arbitration. It was the defendants who refused, and, rather than referring to arbitration their dispute with Cooksey over the latter's refusal to contribute to the advertising pool, brought a suit in state court to resolve it. The situation is a little more complicated, because the arbitration clause appears in the franchise agreement that Cooksey signed with ATI rather than in the advertising-pool agreement that it signed with the dealers. And ATI never sued Cooksey. But rather than seek to bring Cooksey to heel by demanding arbitration to determine the lawfulness of the advertising pool (which the franchise agreement required Cooksey to join), ATI authorized the dealers to sue Cooksey, and they refused Cooksey's request to arbitrate the dispute. We do not know what direct role ATI played in that refusal; but having deliberately forgone a chance to arbitrate the dispute, and thus put Cooksey to the expense of bringing this suit, the defendants have waived their right to insist on arbitration now. St. Mary's Medical Center, Inc. v. Disco Aluminum Products Co., 969 F.2d 585, 588-89 (7th Cir.1992); Ohio-Sealy Mattress Mfg. Co. v. Kaplan, 712 F.2d 270, 273 (7th Cir.1983).
 
 
 24
 The defendants' last argument is that Cooksey agreed that the venue of any suit arising out of the franchise arrangement would be Pennsylvania, not Indiana. The provision concerning venue appears in the franchise agreement too, and so may or may not fall with that agreement. It does not matter. While requiring the franchisee to consent to venue in Pennsylvania if ATI sues it there, the provision does not purport to confine the franchisee's suits to Pennsylvania and should not be interpreted to do so. Paper Express, Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 757 (7th Cir.1992).
 
 
 25
 The complaint should not have been dismissed. The judgment is reversed and the case remanded for further proceedings consistent with this opinion.
 
 
 26
 REVERSED AND REMANDED.