SAN JUAN CEMENT, INC., Plaintiff,

v.

PUERTO RICAN CEMENT CO.,
INC., et al., Defendants.

Civil No. 95–2371(PG).

United States District Court,
D. Puerto Rico.

April 26, 1996.

O'Neill & Borges Law Firm, Hato Rey, PR, for Plaintiff.

McConnell Valdés Law Firm, Reichard & Escalera Law Firm, San Juan, PR, Totti Rodríguez Díaz & Fuentes Law Firm, Hato Rey, PR, for Defendants.

### OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court are co-defendants' motions to dismiss for (1) mootness and (2) lack of subject matter jurisdiction. For the reasons set forth below, both motions are **DENIED.** Accordingly, the stay of discovery ordered by the Court pending resolution of these matters shall be **VACATED.**

### I. Background

This suit was initiated on November 9, 1995 by plaintiff San Juan Cement in an effort to enjoin the then recently announced acquisition of co-defendants Concreto Mixto and Ready Mix Concrete by the principal defendant, Puerto Rican Cement. Plaintiff alleged that the prospective merger would substantially lessen competition in the Puerto Rico cement and concrete markets, in violation of § 7 of the Clayton Act, 15 U.S.C. § 18.[1]

---

1. The Clayton Act's prohibition of anti-competi-    tive mergers provides that:

Plaintiff's request for a temporary restraining order (TRO) enjoining the merger was denied by Judge Laffitte, who issued the decision because of my unavailability at the time. Judge Laffitte denied the request for two reasons: (1) because plaintiff had failed to notify defendants in advance or satisfactorily explain why such notice was impractical, as required by Fed.R.Civ.P. 65(b); and (2) because plaintiff's alleged injury was overly speculative.

The Court then received the following filings from the parties: (1) plaintiff's motion for reconsideration, filed on November 14, which complied with the procedural requirements of Rule 65(b); and (2) defendants' motion to dismiss on the grounds of mootness, filed on November 29. The latter motion informed the Court that the merger between the three co-defendants had taken place on November 21. Puerto Rican cement now owns 100% of Concreto Mixto and 81% of Ready Mix. The case was moot, defendants argued, because the event the prevention of which was the sole relief sought by plaintiff had already taken place. In the meantime, on November 30, the Court denied plaintiff's motion for reconsideration of its TRO request.

The next day, plaintiff filed an amended complaint. Plaintiff realleged the potential antitrust injury, but expanded its requested relief. Plaintiff now seeks, *inter alia*, an order to "hold separate" the functions of the now merged co-defendants, and essentially asks that the merger be unwound so as to return to the *status quo ante*.

The amended complaint takes the wind out of defendant's motion to dismiss for mootness. Because all the relief plaintiff now seeks would be a legitimate exercise of the Court's equitable powers to resolve an alleged violation of the Clayton Act, the Court must DENY co-defendants' motion to dismiss on the grounds of mootness. *See, e.g., United States v. E.I. du Pont deNemours &* *Co.*, 353 U.S. 586, 607, 77 S.Ct. 872, 884–85, 1 L.Ed.2d 1057 (1957) (Court ordered divestiture).

On December 12, defendants filed their second motion to dismiss, this time alleging lack of subject matter jurisdiction. The Court has since received the plaintiff's opposition, and the defendants' replies thereto. The balance of this opinion and order shall consider the Court's subject matter jurisdiction over this case.

## II. Puerto Rico's Cement and Concrete Industries and the Factual Predicates for Jurisdiction

To appreciate defendants' position, we must briefly examine the workings of Puerto Rico's cement and concrete market, and the potential effects of the merger upon it. The following draws from plaintiff's complaint, which is construed as true for the purposes of deciding this motion. We begin with cement: Cement is a powder made primarily from crushed limestone, plus small amounts of other materials. Its manufacture requires crushing and grinding the raw limestone mixture, and then baking the resulting product at temperatures approaching 2500 degrees Fahrenheit. After another round of crushing and grinding, the powder cement may be stored for several months before use.

Cement is the main ingredient in concrete, which is the primary building material for construction projects in Puerto Rico. Concrete is manufactured by mixing cement, water, fine and coarse aggregate (sand and gravel) and various chemical bonding agents. Concrete dries quickly, and, therefore, is not easily transportable. It must be delivered to the construction cite within 90 minutes of mixing, and must be poured within 30 minutes thereafter.

Because of the limits on transporting concrete, cement is sold in two distinct forms. First, in bulk, to concrete manufacturers, who mix the cement with the other raw

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly.
15 U.S.C. § 18.

ingredients necessary to manufacture concrete at their facilities, and then deliver the wet concrete in large cylinder-agitation trucks to construction cites for pouring. This type of concrete is known as ready-mix. Cement is also sold in bags directly to hardware stores for resale to the public. Plaintiff is primarily concerned about the impact of the merger upon the ready mix market.

There are only two cement manufacturers in Puerto Rico. The largest, Puerto Rican Cement—the defendant in this case—accounts for approximately 60% of the total annual sales of cement in Puerto Rico, amounting to approximately $80 million annually. The plaintiff, San Juan Cement, supplies the remaining 40% (approximately $60 million in annual sales). In 1994, approximately 1.5 million tons of cement were sold in Puerto Rico. Sales to ready mix concrete manufacturers amounted to almost 60% of all cement sales.

The ready mix concrete industry is more diversified than the cement industry. Prior to the merger, there were four manufacturers on the Island who together possessed approximately 70% of the market; at least seven other concrete manufacturers divide the remaining 30%. Pre-merger, Ready Mix and Concreto Mixto supplied approximately 21% and 16% of the market respectively, with combined revenues of $60 million in 1994. As a merged entity, the two firms are now Puerto Rico's largest concrete manufacturer, supplying approximately 37% of Puerto Rico's concrete. Their presence in the San Juan market (North–Eastern region of the Island) is even larger, where they account for approximately 56% of sales.

The merger between Puerto Rican Cement and the concrete manufacturing co-defendants constitutes a "vertical" merger, as such a combination of businesses is known in antitrust law. *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 1522–23, 8 L.Ed.2d 510 (1962). "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'" *Id.* Puerto Rican Cement is a supplier of cement; Concreto Mixto and Ready Mix are its customers. "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition.'" *Id.* at 323–24, 82 S.Ct. at 1523 (quoting *Standard Oil Co. of California v. United States,* 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371 (1949).

Plaintiff alleges that the merger will have just such an impact on its business. In particular, plaintiff notes that Ready Mix has, for the past five years, been contractually bound to purchase nearly 100 million pounds of cement annually from San Juan Cement, amounting to more than $5 million in annual sales for San Juan Cement. (In fact, Ready Mix's actual purchases have exceeded its contractual obligation.) This same contract binds Ready Mix to annual purchases of nearly 50 million pounds of cement from now until the year 2001. The merger between Ready Mix and Puerto Rican Cement, plaintiff alleges, will curtail any purchases by Ready Mix above its minimum obligation, and preclude such sales after 2001. Furthermore, Concreto Mixto is now "off limits" as a potential customer.

Plaintiff also contends that the new, vertically integrated defendants could engage in predatory pricing of ready-mix concrete. This could eventually force competing ready-mix retailers out of the market, thus substantially lessening competition in the ready-mix concrete market, sales to which account for much of plaintiff's business.[2]

Plaintiff also complains of the "horizontal" effects of the new affiliation between Concreto Mixto and Ready Mix. "An economic arrangement between companies performing similar functions in the production or sale of comparable goods or services is characterized as 'horizontal'". *Id.* 370 U.S. at 334, 82

---

2. Of course, simply because the defendants might sell ready mix concrete more cheaply does not make the merger illegal. Reduced prices may be the product of greater efficiency, not predatory pricing strategies. This is why vertical mergers are subject to "Rule of Reason" analysis, and not *per se* rules of illegality. *See Eastman Kodak v. Image Technical Services,* 504 U.S. 451, 466–67, 112 S.Ct. 2072, 2081–82, 119 L.Ed.2d 265 (1992).

S.Ct. at 1528–29. Pre-merger, Concreto Mixto and Ready Mix were competitors in the ready mix concrete market. They are now both subsidiaries of Puerto Rican Cement, and will, therefore, presumably coordinate, among other things, pricing and marketing decisions.

The validity of such horizontal arrangements in the face of the antitrust laws depends upon a variety of considerations, including, "the relative size of and number of the parties to the arrangement; whether it allocates shares of the market among the parties; whether it fixes prices at which the parties will sell their product; or whether it absorbs or insulates competitors." *Id.* at 334–35, 82 S.Ct. at 1529.

The market power of the newly merged co-defendants in the ready mix concrete market, plaintiff contends, could "substantially ... lessen competition, or ... tend to create a monopoly." 15 U.S.C. § 18. Plaintiff expresses fear of a group boycott and predatory pricing, pointing out that the Herfindahl–Hirschman market concentration index (HHI) will increase from a pre-merger level of 1,359 to 2,029. In the San Juan market, the post-merger HHI is 3,147. According to the U.S. Department of Justice's pre-merger guidelines, a merger which causes such a change in the HHI is presumptively anti-competitive.

Of course, the above is simply a recitation of plaintiff's allegations, which the Court must take as true pursuant to Fed.R.Civ.P. 12(b)(1). Whether or not the merger is, in fact, anti-competitive, or so intended, is a question for a jury. Defendants contend, however, that no federal trial should take place. They assert that this Court lacks subject matter jurisdiction over the dispute, citing the "purely local" nature of the Puerto Rico cement and concrete industries.

Given the physical properties of the building materials in question, and Puerto Rico's status as a small island one thousand miles from the U.S. mainland, all the cement and concrete that is used in Puerto Rico is manufactured here, and none, as far as the Court is aware, is exported. Furthermore, most of the raw materials used in the manufacturing of Puerto Rico cement and concrete come from the Island—limestone and sand being among the few natural resources available in abundance on the Island. The only aspects of the industry which plaintiff cites to meet the jurisdictional burden that the challenged merger would "substantially affect interstate commerce" are the defendants' purchases of equipment, spare parts, and other materials from firms outside Puerto Rico. To the extent defendants' merger has anti-competitive effects, plaintiff asserts, inter-state commerce will be affected.

For their part, defendants argue (1) that they are not in and their activities do not "substantially affect" interstate commerce, and (2) even if they are, their businesses are not "so connected with interstate commerce that it is logical, as a matter of practical economics, to believe that the unlawful activity will affect interstate commerce." *Wells Real Estate v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 808 (1st Cir.1988). In other words, defendants assert that a sufficient nexus must exist between the allegedly illegal *acts* (the merger) and interstate commerce, and that their "general" participation in interstate commerce (e.g., purchases of supplies from U.S. manufacturers) is insufficient to establish the "affecting commerce" requirement necessary to support jurisdiction.

### III. Case Law

Were this case before the Court prior to the Supreme Court's decision in *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), defendants would likely be correct. The First Circuit's approach to antitrust jurisdiction required a nexus between the allegedly illegal conduct and interstate commerce. *See Córdova & Simonpietri Ins. v. Chase Manhattan Bank,* 649 F.2d 36 (1st Cir.1981); *Wells Real Estate, supra.* Whether *Córdova* remains "good law" after *Summit Health,* however, is an open question, and has not directly been addressed by any court in the First Circuit. The parties have vigorously and ably briefed the issue. This section considers the arguments.

The starting point is the Supreme Court's decision in *McLain v. Real Estate Bd. of*

*New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). The case was a class action on behalf of all persons employing real estate brokers in New Orleans in the early 1970s. The defendants were real estate brokerages, the brokers themselves, and their trade associations. The complaint alleged a price fixing scheme. *Id.* at 234–35, 100 S.Ct. at 505–06.

The defendants sought to dismiss the case on jurisdictional grounds, alleging that their business was purely local. Defendants suggested a two-part test to evaluate jurisdiction, which was accepted and applied by the district and appellate courts. The test required that plaintiffs allege and prove (1) that the general conduct of the defendants had a substantial effect on interstate commerce, and (2) that the particular conduct challenged was an integral and inseparable part of that general conduct. *Id.* at 236–37, 100 S.Ct. at 506–07. Both the district court and the court of appeals agreed that plaintiffs satisfied the first step, but failed the second. *Id.* at 239–40, 100 S.Ct. at 507–08.

The Supreme Court opened its analysis with a statement of the general principles guiding application of the Commerce Clause: "The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce." *Id.* at 241, 100 S.Ct. at 508 (citations omitted). The Court affirmed that the reach of the Sherman Act was coextensive with Congress' authority under the Commerce Clause.[3] *Id.*

The Court then explained the minimal showing required to satisfy the "affecting commerce" standard:

> To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate

commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful.

*Id.* at 242–43, 100 S.Ct. at 509. This statement appeared to expressly reject the test urged by the realtors that the challenged activity itself must have a specific nexus with interstate commerce.

Unfortunately, however, the Court did not stop there. For after stating that no specific nexus was required, the Court then set forth the evidence presented in the case to establish the very connection between the purchase of residential real estate and interstate commerce that, *only two pages previously,* the Court had said was unnecessary. "To establish federal jurisdiction in this case, there remains only the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown *'as a matter of practical economics'* to have a not insubstantial effect on the interstate commerce involved." *Id.* at 246, 100 S.Ct. at 511 (citations omitted) (emphasis added).

The Court then "applied" this standard as follows:

> It is clear, as the record shows, that the function of respondent real estate brokers is to bring the buyer and seller together on agreeable terms. For this service the broker charges a fee generally calculated as a percentage of the sale price. Brokerage activities necessarily affect both the frequency and the terms of residential sales transactions. Ultimately, whatever stimulates or retards the volume of residential sales, or has an impact on the purchase price, affects the demand for financing and title insurance, those two commercial activities that on this record are shown to have occurred in interstate commerce. Where, as here, the services of respondent real estate brokers are often employed in transactions in the relevant market, petitioners at trial may be able to show that

**3.** The Clayton Act's reach is similarly broad. *United States v. Gillies,* 851 F.2d 492, 493 (1st Cir.1988).

respondents' activities have a not insubstantial effect on interstate commerce.

*Id.* Thus, whatever the Court meant by "as a matter of practical economics," as applied in *McLain,* it entailed a fairly loose connection between the challenged conduct and interstate commerce. For the contacts with interstate commerce cited by the Court, and which it found sufficient to sustain jurisdiction—obtaining financing and title insurance from firms with extensive interstate contacts—were derivative of the brokerage business.

Nonetheless, the internally contradictory aspects of *McLain* led to conflicting applications by the lower Courts. The "practical economics" language was read by a number of circuits, including the First, as trumping the language in *McLain* which rejected a specific-nexus test for "affecting commerce" jurisdiction. The leading case is *Córdova & Simonpietri Ins. v. Chase Manhattan Bank,* 649 F.2d 36 (1st Cir.1981), an opinion written by now-Justice Breyer on appeal from a decision by this Court.

*Córdova* involved a Sherman Act claim by an insurance brokerage against a fire and casualty insurance company and Chase Manhattan Bank. Plaintiffs alleged an unlawful agreement to reinstate policies cancelled because of phony losses without making use of plaintiff's brokerage services. This Court found, and the First Circuit affirmed, "that plaintiffs had failed to make sufficient showing of impact upon 'interstate commerce' to bring defendants' alleged conduct within Sherman Act sections 1 and 2." *Id.* at 44.

The court of appeals purported to apply *McLain,* despite finding the Supreme Court's decision "somewhat ambiguous." *Id.* at 45. Not surprisingly, given the result eventually reached, the language which the first circuit found ambiguous was that which rejected the specific nexus requirement. The Court, instead, chose to cast its lot with the "practical economics" approach:

> [P]laintiffs in ... [a] price-fixing case ... [must] do more than simply point to some aspect of defendants' business which involves interstate commerce. Were so minimal a showing sufficient, the most local of conspiracies would fall inside, or outside

the Sherman Act, depending on whether a defendant firm happened to be owned by an interstate conglomerate. The [Supreme] Court does not sanction that result. Rather, its opinion [in *McLain* ] simply emphasizes that a plaintiff need not prove that a defendant's unlawful activities *actually* affected interstate commerce; but it goes on to suggest that defendants' business still must be so connected with interstate commerce that it is logical, as a matter of practical economics, to believe that the unlawful activity will affect interstate commerce.

*Id.* (citations and footnote omitted).

The above quoted language from *Córdova,* of course, mischaracterizes *McLain.* The Supreme Court found jurisdiction in *McLain* not because defendants were subsidiaries of an interstate conglomerate, as Judge Breyer's opinion suggested. There was no evidence to that effect anywhere in the decision. Rather, jurisdiction in *McLain* was based on defendants' secondary business dealings with interstate banks and title insurance companies, which had nothing to do with the alleged Sherman Act violation.

Nonetheless, the First Circuit interpreted *McLain*—or "finessed" it, as characterized by Justice Scalia in *Summit Health,* 500 U.S. at 335, 111 S.Ct. at 1850 (Scalia, J., dissenting)—as requiring a specific nexus between the challenged activity and interstate commerce. Many other circuits, it should be added, did the same. William F. Detwiler, Note, *Redefining "Interstate Commerce" Jurisdiction Under the Sherman Act: Summit Health, Ltd v. Pinhas,* 37 Vill.L.Rev. 373, 386–87 (1992). The First Circuit reaffirmed its position in *Wells Real Estate v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 808 (1st Cir.1988).

Such was the state of the law when the Supreme Court took *cert.* in *Summit Health,* with some circuits applying the "specific nexus" test, thus restricting federal antitrust jurisdiction, and others rejecting that circumscribed approach. The case arose from a Sherman Act suit brought by Dr. Pinhas against the hospital (Summit Health). A peer review committee had revoked Pinhas'

practice privileges at the hospital. Pinhas alleged that the decision constituted a "group boycott" or concerted refusal to deal, in violation of the Act. The defendants sought to dismiss the case on the grounds that the Sherman Act did not reach isolated peer review decisions whose impact was "local" in nature. The district court granted the motion, but the Ninth Circuit reinstated the claim. *Summit Health,* 500 U.S. at 324–28, 111 S.Ct. at 1844–46.

The hospital in *Summit Health,* as had the respondents in *McLain,* urged the Court to focus on the specific nexus between the peer review decision and interstate commerce, and to require proof of that nexus at the pleading stage. Conceding that they were engaged in interstate commerce as a general matter, the hospital nonetheless argued that such general activity was irrelevant. Rather, the hospital sought to have the Court focus on the purely local effect of the decision: the elimination of one physician from practicing ophthalmology in one hospital in Los Angeles.

The logic of the Supreme Court's resolution of the question is, frankly, difficult to follow, with one sentence seeming to contradict the next. First, citing *McLain,* the Court reiterated that proof of actual interstate consequences was not required at the pleading stage, observing that antitrust liability could be imposed based on illegal intent *or* effect. *Id.* at 330–31, 111 S.Ct. at 1847–48. Thus, the Court appeared to reject a specific nexus requirement.

But the Court then shifted focus. Relying on *per se* horizontal price-fixing cases, the Court found that "as a matter of practical economics" it was safe to presume that "if the conspiracy alleged in the complaint is successful . . . there will be a reduction in the provision of ophthalmological services in the Los Angeles market." *Id.* at 331, 111 S.Ct. at 1848 (citation omitted). Thus, like the ripple effect from throwing a stone in a pond, the Court concluded "that the defendants' agreement 'almost surely' had a market-wide impact and therefore an effect on interstate commerce." *Id.* (quoting *Burke v. Ford,* 389 U.S. 320, 322, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967) (conspiracy among Oklahoma li-

quor wholesalers found to affect interstate commerce).

It is unclear how this analysis should be interpreted. On the one hand, the Court seemed to suggest that plaintiff had satisfied even the specific nexus test urged by the petitioner, since the challenged conduct was presumed to *directly* affect interstate commerce, if only imperceptibly. On the other hand, to the extent that such secondary effects constitute "affecting interstate commerce," the requirement has no practical limitation on the reach of the Sherman Act. The Court seemed to reinforce this latter view by quoting the key language from *McLain:* "Petitioner need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy." *Id.* (quoting *McLain,* 444 U.S. at 242–43, 100 S.Ct. at 509).

*Summit Health* contains other internal contradictions, leading many commentators to characterize the opinion as ambiguous. *See, e.g.,* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* § 232.1c at 300–06 (1994 Supp.) What is clear, however, is that the Court found jurisdiction, despite facts which involved only "one doctor, dropped by one hospital." *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 781 (7th Cir.1994) (Posner, C.J.). Thus, despite the opinion's linguistic ambiguity, the lower court's have almost unanimously followed what the Supreme Court *did* in *Summit Health* (if not what it said), and have rejected the specific nexus requirement. *See, e.g., Hammes, id.* at 780; *Brader v. Allegheny Gen'l Hosp.* 64 F.3d 869, 875 (3d Cir.1995); *Carleton v. Vermont Dairy Herd Improvement Ass'n,* 782 F.Supp. 926, 934 (D.Vt.1991).

The lower courts' approach is in accord with Justice Scalia's interpretation of the majority decision:

As I understand the Court's opinion, the test of Sherman Act jurisdiction is whether the entire line of commerce from which Dr. Pinhas has been excluded affects interstate commerce. Since excluding him from eye surgery at Midway Hospital effectively excluded him from the entire Los Angeles

market for eye surgery ... the jurisdictional question is simply whether that market affects interstate commerce, which of course it does.

*Summit Health,* 500 U.S. at 336, 111 S.Ct. at 1850 (Scalia, J., dissenting). As Judge Posner has stated, "[i]t is quite enough, probably more than enough, if the complaint alleges that the plaintiff was engaged in interstate commerce and was injured by the alleged antitrust violation." *Hammes,* 33 F.3d at 782.

Thus, it is the Court's view that *Summit Health* over-rules *Córdova* and its progeny in this circuit. In *Córdova* the court of appeals found that, broadly construed, the challenged agreement constituted a tie or exclusive dealing arrangement. Such a barrier, if, in fact, it existed, "would consist of making it more difficult for firms to enter the business of brokering 'single interest' insurance policies." *Córdova,* 649 F.2d at 46. Nonetheless, the Court found that the jurisdictional requirement of "substantially effecting inter-state commerce" had not been met. "Unlike price fixing, which directly affects price and output," the Court found "no reason to believe, in logic or practical economics," that the barrier to entry at issue in the case "could have more than an insubstantial effect upon inter-state commerce." *Id.*

The same approach would have denied jurisdiction in *Summit Health.* As in *Córdova,* the peer review decision which excluded Dr. Pinhas from practicing at the Summit Health hospital was a group boycott which had the effect of slightly diminishing the supply of medical services. If anything, the effect on commerce was greater in *Córdova,* however, because the conspiracy was directed at all those who banked with Chase Manhattan— one of the Island's largest commercial banks. In *Summit Health,* however, the conspiracy only revolved around one doctor at one hospi-

tal. Nonetheless, the Supreme Court found jurisdiction in *Summit Health,* suggesting that *Córdova* and its progeny no longer remain "good law."

## IV. Discussion

Based on the discussion above, all plaintiff need do to survive defendants' motion to dismiss is allege a general connection with interstate commerce, and an effect thereon resulting from defendants' allegedly illegal conduct. The facts presented above demonstrate that San Juan Cement has met this minimal requirement. Plaintiff has uncontrovertedly alleged that the parties purchase materials and supplies from inter-state sources. Thus, the parties, as a general matter, participate in inter-state commerce. To paraphrase the Court in *Summit Health,* "as a matter of practical economics," the effect of the alleged conspiracy on the defendants' "purchases of out of state ... supplies" and other materials "establish[es] the necessary interstate nexus." *Summit Health,* 500 U.S. at 329, 111 S.Ct. at 1847.[4]

Other considerations support this result. The essence of defendants' argument is that a conspiracy to restrain trade in Puerto Rico's cement and concrete industries could not affect interstate commerce because of the isolated nature—in geographic terms—of Puerto Rico's economy. "The two ready-mix concrete manufacturers involved herein do not sell their products outside of Puerto Rico and derive no revenue from out-of-state sources." Ready Mix' Opposition at 5. This, they argue, defeats federal antitrust jurisdiction.

The argument must fail, however, because it simply proves too much. Based on the defendants' theory, a conspiracy among local grocers, for example, to concertedly raise the price of all imported produce would be im-

---

**4.** Consider, also, the following: A restraint of trade in the building materials market "necessarily affects" the price and availability of these materials for the construction industry, which necessarily affects "the volume of ... sales and therefore the demand for financing and title insurance provided by out-of-state concerns." *Summit Health,* 500 U.S. at 322, 111 S.Ct. at 1848 (quoting *McLain,* 444 U.S. at 246, 100 S.Ct. at 511).

Curiously, given *McLain,* plaintiff did not plead the factual predicates for this argument. Thus, it is not the basis for the Court's decision. 5A Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1350 at 218–19 (motions to dismiss for lack of subject matter jurisdiction will be construed broadly and liberally but argumentative inferences favorable to the pleader will not be drawn). Nonetheless, the Court has considered this obvious fact in reaching its decision.

724

mune from federal antitrust scrutiny. The grocers would simply assert that they do not sell their products outside of Puerto Rico or derive any revenue from outside the Commonwealth. The same is true of any number of important industries on the Island.

A passage from Judge Posner's decision in *Hammes* is instructive. The case involved a price fixing and market allocation scheme run by a number of AAMCO Transmission stores in Indianapolis. In reversing the district court's dismissal of the case for lack of jurisdiction, Judge Posner observed that

> Even if Indiana were a vehicular autarky, so that all the parts that the AAMCO dealers install in the transmissions they repair and all the transmissions they sell as replacements of unrepairable transmissions were fabricated in Indiana, a conspiracy among the Indianapolis dealers to eliminate competition among themselves would [still] restrain interstate commerce.

*Hammes*, 33 F.3d at 780. The result followed from the inter-connected nature of our nation's economy—the achievement and preservation of which is the purpose of the constitution's commerce clause.

The same considerations control here. In holding the dormant commerce clause applicable to Puerto Rico, the First Circuit observed that *"[f]ull economic integration is as important to Puerto Rico as to any state in the Union."* *Trailer Marine Transport Corp. v. Rivera Vázquez*, 977 F.2d 1, 8 (1st Cir.1992). Puerto Rico is part of the United States—if not a state itself. Therefore, it simply defies logic to believe that a conspiracy of the sort alleged here does not fall under the purview of the federal antitrust laws.

## V. Conclusion

The above considerations suggest both that plaintiff's claim is not moot and that the Court has subject matter jurisdiction over this case. Defendants' motions (**Dkts. # 9 & # 15**) are, therefore, **DENIED.** Accordingly, the stay of discovery is vacated (*see* Dkt. # 29).

**IT IS SO ORDERED.**