24

David Weaver ADAMS, et al.,
Appellants,

v.

PAN AMERICAN WORLD AIRWAYS,
INC., a domestic corporation, et al.

John Eric CLIFTON, et al., Appellants,

v.

PAN AMERICAN WORLD AIRWAYS,
INC., a domestic corporation, et al.

John Eric CLIFTON, et al.

v.

PAN AMERICAN WORLD AIRWAYS,
INC., a domestic corporation, et al.

Appeal of UNION DE TRANSPORTS
AERIENS. (Two Cases)

David Weaver ADAMS, et al.

v.

PAN AMERICAN WORLD AIRWAYS,
INC., a domestic corporation, et al.

Nos. 86–5468, 86–5469, 86–5538
and 86–5540.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 20, 1987.

Decided Sept. 1, 1987.

As Amended Oct. 1, 1987.

Jacob A. Stein, Washington, D.C., with whom Patrick A. Malone was on the brief for cross-appellee, Robert Beckman, in Nos. 86–5540 and 86–5538.

Robert M. Beckman, with whom David M. Kirstein was on the brief for appellants, David Weaver Adams, Washington, D.C., et al. in Nos. 86–5468 and 86–5469.

Sidney S. Rosdeitcher, New York City, with whom Leonard N. Bebchick, Gary D. Wilson, Carol Lee, Robert B. von Mehren, Robert J. Geniesse, Fred D. Turnage, Michael W. Dolan, Douglas Rosenthal, Willard K. Tom, James J. Murphy, David G. Feher, Lawrence A. Short, William Karas, David H. Coburn, Robert J. Higgins, James van R. Springer, Eugene M. Goott, Washington, D.C., John W. Dickey, Mark McCall, Veselin M. Scekic, Robert Fabrikant, Celestino Pina, George T. Manning and Charles P. Murdter, New York City, were on the brief for appellees, Pan American, et al. in Nos. 86–5468 and 86–5469.

Sanford C. Miller, New York City, with whom Maurice J. Noyer and John McConnell were on the brief for Union de Transports Aeriens, cross-appellant in Nos. 86–5548 and 86–5540 and appellee in Nos. 86–5468 and 86–5469.

Before RUTH B. GINSBURG and WILLIAMS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

**1.** The persons named as defendants vary slightly from case to case.

**2.** *Laker Airways Ltd. v. Pan American World Airways, Inc.,* No. 82–3362 (D.D.C. filed Nov. 24, 1982); *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* No. 83–0416 (D.D.C. filed Feb. 15, 1983); *Laker Airways Ltd. v. Union de Transport Aeriens,* No. 83–2791 (D.D.C. filed Sept. 22, 1983) [Available on WESTLAW, DCT database].

WILLIAMS, Circuit Judge:

This action is the fourth in a series of antitrust suits spawned by the collapse of Laker Airways Limited. The core allegation in each suit is that a group of airlines, an aircraft manufacturer and the latter's subsidiary conspired to drive Laker out of business, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1982 & Supp. III 1985).[1] The first set of actions, *Laker I,*[2] was brought by Laker itself and culminated in a settlement requiring defendants to pay substantial sums to Laker's stockholders, creditors, and attorneys. *See Adams v. Pan American World Airways, Inc.,* 640 F.Supp. 683, 684 (D.D.C. 1986). The second, *Laker II,* was initiated by a class of transatlantic travelers asserting that the destruction of Laker forced them travel on more expensive airlines. This too was settled, with the defendants establishing a fund to provide plaintiffs reduced airfares for a five-year period. *In re Atlantic Air Travel Antitrust Litigation,* No. 84–1013, mem. order (March 18, 1986 D.D.C.) (approving settlement). The third, *Laker III,* was brought by a travel agent claiming that the demise of Laker caused it to lose business. This action was dismissed for want of standing. *Brian Clewer, Inc. v. Pan American World Airways, Inc.,* No. 86–119 (C.D.Cal. May 21, 1986), *aff'd,* 811 F.2d 1507 (9th Cir.1987).

Plaintiffs in the present action, a group of 313 former Laker employees,[3] allege that the illegal conspiracy cost them their jobs. As recompense they seek treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15 (1982). The District Court concluded that plaintiffs lacked standing to bring an antitrust action and granted defendants' motion to dismiss. *Adams v.*

**3.** Plaintiffs represent the full range of personnel employed by a major airline, from pilots and flight attendants to managers, administrators and reservation agents, to engineers, mechanics and shop personnel. *Adams* Complaint ¶¶ 3–300M, Joint Appendix ("J.A.") at 44–150.

*Pan American World Airways, Inc.,* 640 F.Supp. at 684–86. We affirm.

### I.

Section 4 of the Clayton Act permits "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to bring a treble-damages action. 15 U.S.C. § 15(a). This language, however, has never been read literally to allow suit by every party affected by an antitrust violation's "ripples of harm." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–77, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982).

The first prerequisite to maintaining a § 4 action is that the plaintiff have suffered the *kind* of injury the antitrust laws were designed to prevent. "The antitrust laws ... were enacted for 'the protection of *competition,* not *competitors.*'" *Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)) (emphasis in original). Thus, only harm stemming from a reduction in competition qualifies as injury cognizable under the antitrust laws. *E.g., id.; see also Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (extending *Brunswick* to claim for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26 (1982)).

In addition to alleging "antitrust injury," the would-be claimant must show that it is a "proper plaintiff." *See Cargill,* 107 S.Ct. at 489 n. 5; *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535–46, 103 S.Ct. 897, 907–13, 74 L.Ed.2d 723 (1983). The Court's guiding principle has been to exclude as plaintiffs those whose suits might "undermine[ ] the effectiveness of treble-damages suits." *Associated General,* 459 U.S. at 545, 103 S.Ct. at 912 (citing *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977)). Claims of remote victims could severely complicate an action by more direct ones, raising the latters' costs of suit. Further, the interest in avoiding multiple recoveries may force courts to reduce awards to the direct victims. These impairments of direct victims' incentive to sue could jeopardize the effectiveness of the treble-damage claim. *Associated General,* 459 U.S. at 544–46, 103 S.Ct. at 911–13; *Blue Shield of Virginia v. McCready,* 457 U.S. at 475 n. 11, 102 S.Ct. at 2546 n. 11; *Illinois Brick,* 431 U.S. at 745, 97 S.Ct. at 2074; *cf. Cargill,* 107 S.Ct. at 489–90 nn. 5, 6 (such concerns less relevant to suit for injunctive relief under § 16 of the Clayton Act, as duplicative lawsuits and multiple recoveries not involved). *See generally* Page, *The Scope of Liability for Antitrust Violations,* 37 Stan.L.Rev. 1445, 1483–98 (1985); Landes & Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick,* 46 U.Chi.L.Rev. 602, 608–25 (1979).

Accordingly, once plaintiff has crossed the threshold by alleging a genuine antitrust injury (one deriving from a decrease in competition), the Court directs us to consider such factors as whether the injury is direct (compared to that of other victims), whether the claim for damages is "speculative," and whether the case presents "the potential for duplicative recovery or complex apportionment of damages." *Associated General,* 459 U.S. at 545, 103 S.Ct. at 912; *see also id.* at 538–45, 103 S.Ct. at 908–12.[4]

While plaintiffs allege an antitrust injury, we find that the other factors control-

---

**4.** Plaintiffs vigorously assert that under the rubric of *Associated General* the defendant's specific intent to injure plaintiff is also a factor in the proper-plaintiff analysis. Although plaintiffs' position has some supporting precedent, *see Los Angeles Memorial Coliseum Commission v. National Football League,* 791 F.2d 1356, 1363 (9th Cir.1986), we read *Associated General* as saying only that a showing of such intent may be required to establish an antitrust violation (and thus necessary to avoid a motion to dismiss, *see United States v. Columbia Steel Co.,* 334 U.S. 495, 522 & n. 19, 68 S.Ct. 1107, 1121 & n. 19, 92 L.Ed. 1533 (1948)), and may help focus the standing analysis. *See Associated General,* 459 U.S. at 537 & nn. 35–37, 103 S.Ct. at 908 & nn. 35–37.

ling under *Associated General* preclude accepting them as proper plaintiffs.

## II.

### A. *Antitrust Injury*

The only market where an illegal restraint is alleged to have taken place is the transatlantic air transportation market. Amended *Adams* Complaint ¶ 46, Joint Appendix ("J.A.") at 217–18. Plaintiffs supply services (their labor) to competitors selling in that market. While decreased competition will almost invariably harm consumers, its effects on suppliers such as plaintiffs are quite complex. Output is greater at competitive levels than in a cartelized market; everything else being equal, a competitive industry will require more employees, increasing job opportunities for persons such as plaintiffs. Indeed, plaintiffs represented at oral argument that *none* among them had managed to obtain employment comparable to that previously held with Laker. This suggests a direct loss from the contraction of output.

The effects do not stop there, however. Competition might conceivably raise wages. The more workers demanded (to handle higher output), the more lucrative the alternative occupations from which workers must be attracted, and the higher the wages needed to attract them. But competition also generates strong pressure to cut costs, including wages. *Associated General*, 459 U.S. at 539, 103 S.Ct. at 909; *cf.* S. MORRISON & C. WINSTON, THE ECONOMIC EFFECTS OF AIRLINE DEREGULATION 43–46 (1986).[5] Workers as a group thus may well expect to do better in a cartelized industry, and may even seek to bring about cartelization.[6] *See Associated General*, 459 U.S. at 539–40, 103 S.Ct. at 909.

We cannot now determine (and probably could not even after trial) whether plaintiffs' gains from reduced competition predominate over their losses. An accurate assessment of the alleged cartelization's effect would require computation of the present discounted value of the net change in their expected income streams.[7] Even a Laker employee who has not yet obtained similar employment may do so tomorrow; if cartelization in fact raises wages, it may do so sufficiently to offset the present value of his losses (both those incurred before suit and expected to be incurred thereafter). On the other hand, it may not.

We believe that plaintiffs can properly be said to have alleged an antitrust injury—the failure to secure employment comparable to their Laker jobs from the date of Laker's folding to the filing of the complaint. Thus they have crossed the *Brunswick* threshold. But the ambiguity of cartelization's effects on their welfare fatally affects their case under the remaining factors pinpointed by *Associated General*.

### B. *Directness of Injury*

Comparison of this case with *Associated General* is complicated by "the absence of specific allegations" there. 459 U.S. at 541 n. 46, 103 S.Ct. at 910 n. 46. But the Court discerned two possible theories, one of which closely parallels the present case:[8]

---

**5.** The study finds a negative effect on wages. For the airlines, of course, decartelization was an aspect of deregulation. Regulation of prices on a cost-of-service basis has an independent tendency to relax cost control efforts, as firms can keep only a portion of their cost savings, so the case is not a pure test of the effects of increased competition.

**6.** Plaintiffs describe themselves as members of a "highly competent and highly motivated work force" willing to work for less than their counterparts employed by defendants. *See* Brief of Plaintiffs at 6. This does not support an inference that they are necessarily net losers from cartelization. If they have those attributes, they will surely be attractive candidates for jobs opening up in the cartelized transatlantic market.

**7.** The "expected" value of gains from cartelization would refer to the incremental wage income, discounted for the possibility that the plaintiff may secure no job because of the reduced output in the market as a whole.

**8.** In the alternative theory, defendant association of contractors illegally coerced the victim landowners, who as a result switched to non-union contractors, who resisted plaintiff union's organizing efforts in order to avoid loss of business. The Court characterized this as involving injury from "the conduct of persons who are not victims of the conspiracy [the non-union con-

defendant association of contractors illegally coerced the victim landowners, who switched from victim union contractors to contractors employing non-union workers; the union contractors reduced hiring, causing workers to be less ready to join plaintiff union and pay dues. 459 U.S. at 541 n. 46, 103 S.Ct. at 910 n. 46. Here the chain is shorter: the victim Laker collapses; plaintiff employees lose their jobs. There is no need for a link paralleling the final one of *Associated General, i.e.,* workers responding by greater resistance to plaintiff.

But the Court appeared to denigrate the significance of the final necessary link. It observed that the harm to the union was "even more indirect than *the already indirect injury to its members,* yet a number of decisions have denied standing to employees with merely derivative injuries." *Id.* at 541 n. 46, 103 S.Ct. at 910 n. 46 (citations omitted) (emphasis added).

Plaintiffs here characterize the conspiracy as reaching the employees themselves. They claim that the illegal restraint weakened Laker to the point that it had to accept a coconspirator as receiver and that the coconspirator fired plaintiffs. Plaintiffs contend that this last step was vital to the alleged conspiracy because the competitive threat Laker posed would not die until the work force was dismantled.

This effort to remove the Laker link from the chain seems largely a matter of word play. The conspirators allegedly forced Laker to its knees. Whenever that happens to a firm, the web of contracts and relationships which form the essence of the firm will be dismantled. Astute counsel should not be able, merely by feats of characterization, to confer standing on all participants in that web.

However the final dismissal may be labelled, the harm to plaintiffs is one step removed from the harm to Laker. It follows that their claim will be more difficult to develop and prove. *See* Posner & Landes, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick,* 46 U.Chi.L.Rev. 602, 609–15 (1979) (comparing cost to indirect purchasers and direct purchasers of bringing an overcharge case). These difficulties, already alluded to, are discussed further in parts II.C and II.D below. It is a natural consequence of the extra link in the chain.

Nine years ago this court plainly classified injuries such as plaintiffs' as indirect: "Outside the context of professional sports, courts have regularly denied employees standing to sue for antitrust injuries to their employer, generally on the ground that any injury to the employee is 'indirect.'" *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1175 n. 2 (D.C.Cir.1978) (citation omitted). *Cf. Illinois Brick,* 431 U.S. 744–47, 97 S.Ct. at 2074–75 (indirect purchasers lack standing to raise antitrust claims).[9] Employees in professional sports have surmounted the standing inquiry simply because their injuries have stemmed at least in part from restraints in *the labor market itself. See, e.g., Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (plaintiff allegedly blacklisted from employment); *Smith v. Pro Football, Inc., supra* (plaintiff challenging system of restraints on his ability to sell his services to full range of competitors in market). Plaintiffs allege no such restraint in the airline labor market. *Cf. Associated General,* 459 U.S. at 527 & n. 14, 103 S.Ct. at 903 & n. 14 (plaintiff union alleged only a restraint in market for construction contracting and subcontracting and not in market for labor union services).

In a rare handful of cases courts have found standing for employees in the absence of restraints in the labor market. In

tractors, who were in fact indirect beneficiaries of the conspiracy]," *id.* Plaintiffs' claim here cannot fairly be said to involve a link of that sort.

9. Unlike *Illinois Brick,* which flatly precludes indirect purchasers from bringing antitrust ac-

tions in virtually all cases, *Associated General* does not go so far as to say that suppliers of an input never have standing to assert a claim for damages resulting from illegal restraints in their purchaser's market. *See* 459 U.S. at 540–42, 103 S.Ct. at 909–11.

*Ostrofe v. H.S. Crocker Co.,* 740 F.2d 739 (9th Cir.1984), plaintiff was the victim of a boycott in the labor market, *id.* at 742–44, but the court also found separately that he had standing because his participation was essential to execution of the conspiracy and that no other party had so strong an incentive to vindicate the public interest in enforcement. *Id.* at 746–47.[10] *See also Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423 (S.D.N.Y.1986) (finding standing for employees coerced into participating in illegal scheme). *But see Bichan v. Chemetron Corp.,* 681 F.2d 514 (7th Cir. 1982) (employee denied standing under similar circumstances), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). Obviously the special circumstance deemed controlling in *Ostrofe* and *Donahue,* even if we assume it is sufficient under *Associated General,* is absent here.

One decision antedating *Associated General* is probably not susceptible of any principled distinction. In *Dailey v. Quality School Plan, Inc.,* 380 F.2d 484 (5th Cir. 1967), the plaintiff was employed in the business of marketing magazine subscriptions to educational institutions under a "school plan," by which such institutions use students to sell subscriptions to the public. He received a salary and commission. He lost his job following the acquisition of his employer in a merger, allegedly illegal, between two of the three largest firms in the field. The court appeared to apply two criteria. First, on the basis of plaintiff's entitlement to commissions, it found that he operated as a business rather than as a mere employee. Second, it applied a vague "proximate cause" test and stated in conclusory form that the injury was direct enough. We doubt if the case survives *Associated General:* (1) the first

point has no apparent significance under *Associated General;* (2) the classification of the injury as direct seems inconsistent with *Associated General's* conclusion; and (3) the decision wholly disregards the other factors and policy values identified by *Associated General* as controlling.[11] *Cf. Eagle v. Star-Kist Foods, Inc.,* 812 F.2d 538 (9th Cir.1987) (applying *Associated General* criteria to deny standing to employees compensated on share-of-revenue basis).

Thus, in the absence of special circumstances not present here, the cases provide no support for suit by employees of a firm victimized by antitrust violations.

Finally, the general rule against employee standing in cases involving no restraint in the labor market finds support in *Associated General's* suggestion that directness is a relative matter:

> The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general.

459 U.S. at 542, 103 S.Ct. at 910–11. Of course the entire logic of *Associated General* supports such a relative approach: it is in large part to preserve the effectiveness of the superior plaintiffs that the inferior ones are denied standing.

▮ Here superior plaintiffs clearly exist—both Laker itself and consumers of transatlantic air transportation. Indeed, they have already asserted claims in their own rights, received substantial settlement payments, and vindicated the public inter-

---

**10.** A prior decision in *Ostrofe,* 670 F.2d 1378 (9th Cir.1982), was vacated and remanded by the Supreme Court for reconsideration in the light of *Associated General. See* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). After the decision on remand, defendants applied for certiorari, but the case was dismissed at the request of the parties. *See* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985).

**11.** *International Association of Heat & Frost Insulators & Asbestos Workers v. United Contrac-* tors Association, Inc., 483 F.2d 384 (3rd Cir. 1973), *amended,* 494 F.2d 1353 (3rd Cir.1974), bears some resemblance to *Associated General,* though with the opposite outcome. Accordingly, we also doubt its viability. We note, however, that there were allegations of anticompetitive effects in the labor market itself, through use of sham agreements to thwart the plaintiff unions' organizational efforts. *See id.* at 392, 396.

est in antitrust enforcement.[12] *Compare Ostrofe v. H.S. Crocker Co.*, 740 F.2d at 746–47 (no one else had as strong an interest as discharged employee in vindicating public interest in antitrust enforcement) (alternative holding). Elusive as the concept of directness may be, we believe that the existence of immediate victims that suffer far less ambiguous antitrust injury militates significantly against standing for these plaintiffs.

## C. *Speculative Damages*

We have already suggested the speculative character of plaintiffs' damages. Their job losses are real ones, and, as noted above, the expansion of output to competitive levels would (other things being equal) tend to increase their wages. But cartel participants' comparative laxity as to costs suggests that they may well ultimately secure more lucrative jobs than those that would have been available in the more competitive industry that would have resulted from the survival of Laker.

Nor is the level of competition in the industry the only relevant variable. In part plaintiffs' economic fate was tied specifically to Laker; we cannot assume its indefinite survival in an exceptionally volatile industry characterized by frequent mergers and bankruptcies, *see Adams v. Pan American World Airways, Inc.*, 640 F.Supp. at 685. Further, the prosperity of each of the 313 plaintiffs would depend on how long he or she would have remained with Laker, with what advancement, what salary increases, etc. Finally the court would need to consider each plaintiff's prospects of obtaining comparable employment in aviation or other industries.[13]

■ Plaintiffs in essence recognize the complexity of calculating their damages

but claim that assessing "damages in this case is no more speculative, abstract or impractical than in personal injury cases where assessment of lost past and future earnings are routinely made by the jury." Brief of Plaintiff at 39 (citing *District of Columbia v. Barriteau*, 399 A.2d 563 (D.C. App.1979)). But the present claim is in antitrust, not tort. Here injury turns on the impact of the alleged wrong on the relevant market itself, so that the fact finders cannot take a market structure as given, as they would in a personal injury litigation. Moreover, *Associated General* requires exclusion of marginally injured parties whose claims tend to complicate the litigation and thereby impair the effective enforcement of the antitrust laws. *See, e.g., Associated General*, 459 U.S. at 543–45, 103 S.Ct. at 911–12.

## D. *Risk of Duplicative Recoveries or Complex Apportionment of Damages.*

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court held that an indirect customer could not bring a treble-damage action for price increases deriving from sales to its suppliers in violation of the antitrust laws. Recognizing that multiple recovery should be avoided, it noted that allowance of indirect purchaser suits would compel apportionment of the recovery. Besides adding complexity to the case, this apportionment would cut down the direct purchasers' recovery and diffuse the incentive to bring treble-damage actions. *Id.* at 735–48, 97 S.Ct. at 2069–76; *see also Associated General*, 459 U.S. at 544, 103 S.Ct. at 911–12.

The present case raises a similar risk of leading either to multiple recovery or to

---

**12.** Plaintiffs argue that because their injuries are discrete from those of Laker and its passengers, the latters' actions have not vindicated the public interest in antitrust enforcement, *i.e.*, their claims are not large enough to be an optimal deterrent. In fact, as we develop below, there is a high probability of substantial overlap between plaintiffs' injuries and those of Laker and its passengers.

**13.** Plaintiffs focus on their inability to obtain employment in the cartelized transatlantic air

transportation market. We see no reason why they are so limited. All of them are qualified for employment in other air transportation markets, and many of their jobs with Laker have exact equivalents outside the air transportation industry.

Plaintiffs also claim to have suffered from emotional distress. If for some reason not revealed to us such injury qualified as an injury to plaintiffs' "business or property," its measurement would further complicate the litigation.

unduly complex litigation. In *Illinois Brick*, the potential conflict was over a single amount, the illegal overcharge; to avoid multiple recoveries, it would be necessary to divide that amount between direct and indirect purchasers on some consistent theory governing the extent to which direct purchasers would pass on the overcharge and the damage recovery. Separate litigations would allow direct purchasers to recover on one set of assumptions as to elasticities, market structure and market behavior, indirect purchasers to recover on another set. *See* 431 U.S. at 741–42, 97 S.Ct. at 2072–73. This would generate powerful claims for joinder of all potential plaintiffs under Federal Rule of Civil Procedure 19, massively complicating the litigation. *Id.* at 737–41, 97 S.Ct. at 2070–72.

Here, concededly, there is no common fund in the sense of the overcharge at stake in *Illinois Brick*. But the problem of conflicting premises is no different. In *Laker I*, Laker's creditors, stockholders, and attorneys sought damages premised on a projection of high profits for Laker. In *Laker II*, Laker's passengers asserted damages premised on Laker's fares being exceptionally low. Laker's employees now seek to collect damages premised on plentiful jobs and generous salaries and benefits. Without joinder it is impossible to avoid liability on inconsistent theories; with joinder would come increased complexity and litigation costs for the directly injured parties.

One may, indeed, conceptualize the case as involving claims on a single quantity of wealth—the increased consumer and producer surplus that a thriving Laker would have generated.[14] The risks of duplicative recoveries on inconsistent theories are in no substantive way different from those

risks in *Illinois Brick*. The Court regarded this concern as relevant even to *Associated General*, where the obscurity of the claim left some uncertainty as to just how plaintiffs' claims would relate to those of the direct victims. 459 U.S. at 544–45, 103 S.Ct. at 911–12. Here, more clearly than there, allowance of the suit would load the direct victims' action with costly excess baggage.

 Nor is it an answer that Laker and its passengers have already settled their claims. Standing must be determined by uniform principles, not by accidents of sequence. A rule opening the door to marginal plaintiffs after settlement would virtually force defendants not to settle until all possible complainants were brought into the action or until the statute of limitations had run. Such behavior would clearly make it more difficult to prosecute antitrust violations and "undermine[ ] the effectiveness of treble-damages suits." *Associated General*, 459 U.S. at 545, 103 S.Ct. at 912. Besides, allowance of the present suit would unequivocally expose defendants to the risk of multiple liability; an alternative the Court has emphatically rejected. *Illinois Brick*, 431 U.S. at 730–31, 97 S.Ct. at 2066–67 (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972)). *See also id.* at 731 n. 11, 97 S.Ct. at 2067 n. 11 (recognizing that risk of multiple liability is particularly great where some parties settle).

The controlling factors under *Associated General* compel the conclusion that plaintiffs lack standing.

### III.

 Before the District Court defendant Union de Transports Aeriens ("UTA") moved for sanctions against plaintiffs' attorney for signing a complaint containing

---

**14.** The extra producer surplus (especially for purposes of this case) includes any increments in plaintiffs' wage income over what they would have been able to earn without Laker's presence in the market. A worker is of course a producer. The wage necessary to attract the marginal worker sets the wage of the inframarginal workers. The latter enjoy producer surplus consisting of the difference between the prevailing wage and the wage necessary to attract them to

the jobs in question. As already noted, the survival of Laker would under some circumstances increase that wage. Thus the producer surplus at issue in Laker's survival encompasses the surplus not only of Laker but also of the inframarginal workers. Ascertainment of the likely allocation of total producer surplus between these (and other suppliers as well) would be a complex task, to say the least.

false allegations in violation of Federal Rule of Civil Procedure 11. Plaintiffs' complaint, which was prepared under extreme time pressures, alleged that UTA competed with Laker in the transatlantic market. In fact, UTA's only service originating in the United States was between Los Angeles and Tahiti. When UTA called the error to plaintiffs' counsel's attention, he did not acknowledge the inaccuracy but instead seized the offensive. He claimed that UTA had raised a matter outside of the pleadings; accordingly, if the court considered UTA's allegations, it would turn UTA's pending motions to dismiss into a motion for summary judgment, thereby justifying discovery by plaintiffs. Within a short time thereafter, however, plaintiffs' counsel amended the complaint to remove the inaccuracy.

The District Court denied UTA's motion without explanation in a one-sentence footnote. Although the District Court's treatment of this matter was lamentably terse, we may overturn its ruling only if it abused its "wide discretion" to determine whether grounds exist to support Rule 11 sanctions. *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C.Cir.1985). The record is not strong enough for us to find an abuse of discretion.

The decision below is

*Affirmed.*