In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3890

ED FIALA,

*Plaintiff-Appellee,*

*v.*

B&B ENTERPRISES, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 2895 — **Gary S. Feinerman**, *Judge.*

ARGUED NOVEMBER 19, 2013 — DECIDED DECEMBER 26, 2013

Before POSNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* This appeal arises out of a RICO class action suit that the district judge dismissed without deciding whether to certify it as a class action. The appeal is from the judge's denial of the defendants' application for an award of their attorneys' fees under Fed. R. Civ. P. 11.

The principal defendant, B&B Enterprises, is a residential real estate developer, mostly of high-end custom-home sub-

divisions. Active in Wasco, a community in northeastern Illinois, in 1994 B&B (actually a company controlled by it but we can ignore that detail) received from the Wasco Sanitary District permits to connect to the district's sewage system almost 800 houses and other buildings that B&B and other developers were building in a subdivision called Fox Mill. (Some allegations concern other subdivisions in the same general area, but, again to simplify the opinion, we'll refer to all the subdivisions as Fox Mill.) In 2010 plaintiff Fiala, the owner of a home in Fox Mill, joined by Tim Kobler Custom Houses, a homebuilder, brought this suit charging that B&B (and other developers, whom we can ignore) had violated RICO by engaging in a "pattern of racketeering activity" (in RICO-speak) consisting of bribery, theft, and fraud, all designed to deprive homeowners and builders of property. 18 U.S.C. § 1962. Kobler has since dropped out of the case, leaving Fiala as the sole plaintiff and appellee.

The alleged scheme involved what are called "Population Equivalents" ("PEs")—specified quantities of sewage (generally 100 gallons per day) that a house or other building (this case is just about houses, however) is estimated to dump into the local sewage system. 225 ILCS 225/3(6); 35 Ill. Admin. Code § 301.345. The more PEs that a house connected to the system produces, the larger and so more costly the system must be to handle all the wastewater discharged into it, and therefore the higher the fee that the sanitary district would be apt to charge for a permit to connect the house to the district's sewage system. The fee is charged to the builder and thus becomes one of the costs that he tries to recoup in the price that he charges for the house.

The Wasco Sanitary District decided to allot 3.5 PEs to each house that would be built in its district because that is the allotment that the state recommends, though does not require, for single-family houses. 35 Ill. Admin. Code § 370, Appendix A.

The complaint alleges that B&B had, mainly through family connections, improperly taken control of the Wasco Sanitary District and used that control to divert to itself permit fees that should have gone to the district to finance an expansion of its sewage system. As Fox Mill expanded, the number of PEs that the sanitary district could grant without having to expand its sewer system ran out; the system was surfeited. B&B, the suit charged, decided—so that it could continue the expansion of Fox Mill—to "steal" PEs from existing homes and sell the stolen PEs to builders, like Kobler. The "stolen" PEs would enable the builder to obtain a sewage permit for the buyer of each of the houses he built.

Why was B&B (allegedly) doing this?

Suppose a sewage treatment facility can process up to 20,000 gallons of wastewater a day—equivalent to 200 PEs. A sanitary district that followed Illinois's recommendation to allot 3.5 PEs to every single-family house would therefore allow only 57 houses to be connected to the sanitary district's sewage system. But 3.5 PEs per house is only an estimate of average wastewater discharge. Those 57 houses might generate more, or fewer, than 20,000 gallons of wastewater per day—fewer if 3.5 PEs per house is a conservative estimate of the amount of wastewater discharged by the average single-family house. And probably it is, since if it were an underestimate the sewage treatment facility would be inadequate.

B&B took advantage of the assumed conservative bias in the estimate to allocate only 2.5 PEs per house. But the plaintiff alleges that in order to obtain the required permits for a residential development B&B represented to the sanitary district that it was allocating 3.5 PEs to each house. This deceit would, in our example, allow B&B to build 80 rather than 57 houses without necessarily straining the sewage treatment facility—if indeed the average wastewater production per house is only 2.5 PEs. The sanitary district would permit the fraud because it was controlled by B&B, and as long as the sewage treatment facility was not strained, the fraud, though creating a risk of harm, would impose no actual harm on the development. Committing the fraud was made easier by a long-standing contract between B&B and the sanitary district, under which B&B collected the permit fees directly from the builders (as we noted earlier), and in exchange promised to pay for the maintenance, and any necessary expansion, of the district's wastewater treatment facility. (Whether the promise was real, given B&B's control of the district, is doubtful.)

B&B's alleged wresting of control of the sanitary district and use of that control to divert to itself fees that should have gone to the district to finance any needed expansion or improvement of the sewage system is the sort of conduct that could if proved violate RICO. See, e.g., *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 233–34 (1989); *United States v. Genova*, 333 F.3d 750, 754 (7th Cir. 2003); *United States v. Cianci*, 378 F.3d 71, 80-81 (1st Cir. 2004); *United States v. Dischner*, 974 F.2d 1502, 1506–07 (9th Cir. 1992). The district judge, however, dismissed the suit for want of "RICO standing." To obtain relief under RICO a plaintiff must be "injured in his business or property," 18 U.S.C.

§ 1964(c). Because that's a subset of all injury, RICO standing (which really ought to be called a limitation on the relief available for a RICO violation) is narrower than Article III standing, which does not place limits on the nature of the actionable injury but requires only a potentially redressable "injury in fact" caused by the defendant's alleged wrongdoing. Compare *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), with *Holmes v. SIPC*, 503 U.S. 258, 265–66 (1992). The question then is whether there was an injury to Fiala's property or to Kobler's business; the parties appear to assume that if neither Fiala nor Kobler has RICO standing, no other class member does either.

The district judge said that "Fiala's PEs are not property and cannot have been taken or stolen from him. The supposed theft therefore does not provide a basis for RICO standing." He was right. A PE is just a measurement unit used to estimate the amount of wastewater that a single-family house is likely to discharge—an estimate for use by the sanitary district in sizing its wastewater treatment facility (for example to comply with environmental regulations, see, e.g., 35 Ill. Admin. Code § 304.120(b)) and in pricing sewage permits accordingly. A PE is not a right to discharge a given amount of wastewater. To treat it as a right would have the absurd consequence that if the district or state agency decided that 3.5 PEs was too conservative an estimate of the amount of wastewater likely to be used by the average single-family home and reduced the allotment to 3 PEs, the homeowner could complain that a portion of his property had been taken for a public use, entitling him to compensation under the Fifth Amendment's just-compensation clause, though in fact he'd sustained no loss.

It would be different if by reducing Fiala's allotment of PEs the sanitary district reduced the amount of waste that he could discharge into the district's sewage system. For then he might have to install a septic tank (if that were permitted), or limit the use of his kitchen and bathrooms, in order to reduce his wastewater discharge—and those would be costs. But, to repeat, the allotment of PEs to a house is not a limit on how much wastewater it can discharge into the sewage system. The fee for a sewage permit is not a fee per PE. The permit entitles you to discharge any amount of wastewater.

So PEs aren't rights; but whether they are or not actually is irrelevant. RICO doesn't require a plaintiff to prove that his property or business was *taken*; all that's required is an *injury* to property or to business. In Fiala's case it would have to be injury to his home. But no direct injury to his home was possible, because the "theft" of one, or for that matter all, of his PEs could not affect his access to or use of the sewage system. He would still have the permit, and the permit runs with the land. (An indirect injury to Fiala from the reduction of his allotted PEs would be possible, however, as we're about to see.) As for Kobler, there is no reason to think he paid more to B&B for "stolen" waste discharge rights than he would have paid to the sanitary district.

Fiala could have been injured indirectly by the scheme if it deprived the sanitary district of fees that could have been used to expand or improve its sewage system or meet other public needs that would benefit Fiala. For the deprivation might have degraded the system, resulting in a backup of wastewater into homes, or have caused the sanitary district to increase taxes to make up for the lost fees. But these pos-

sibilities, though alluded to in the plaintiff's briefs, are not claimed to be a source of compensable injury to members of the class. And any injury to the sanitary district itself is irrelevant to this case, because the district is neither a plaintiff nor a class member—it's a defendant, alleged to be an accomplice of B&B in the scheme to steal and resell PEs.

Yet the district judge surprisingly remarked that the sanitary district was the *direct* victim of the alleged scheme, that it had been included in the litigation only as a "nominal" defendant, and that the "indirect purchaser" doctrine of antitrust law, which forbids a purchaser from the victim of cartel pricing to sue the cartelists even when the immediate victim had passed on some or for that matter all of the cartel's price increase to its customers (the indirect purchasers), *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746–47 (1977); *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 605–06 (7th Cir. 1997), applies to RICO claims as well, as indeed it's been held to do. *Holmes v. SIPC, supra*, 503 U.S. at 265–68; *James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396, 403–04 (7th Cir. 2006); *Carter v. Berger*, 777 F.2d 1173, 1175–76 (7th Cir. 1985); *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986). Not that, so applied, it is an indirect-*purchaser* doctrine. The sanitary district hadn't bought anything from B&B. But the reasons that have been given for the indirect-purchaser doctrine are applicable to a case such as this: it simplifies litigation, avoids the bother and uncertainty of trying to determine how much of an injury to a first tier of victims was transmitted to a second tier, and maximizes the incentive of members of the first tier to enforce applicable law. *Illinois Brick Co. v. Illinois, supra*, 431 U.S. at 745; *BCS Services, Inc. v. Heartwood 88, LLC*,

637 F.3d 750, 756 (7th Cir. 2011); *Adams v. Pan American World Airways, Inc.*, 828 F.2d 24, 26 (D.C. Cir. 1987); 2A Phillip E. Areeda et al., *Antitrust Law* § 346c, pp. 164–65 (3d ed. 2007).

But we don't understand why the sanitary district—B&B's alleged accomplice—should be thought merely a "nominal" defendant. The indirect-victim doctrine (as the indirect-purchaser doctrine should be called when there's no purchaser) does not bar a suit against an accomplice. No matter; the plaintiff has not challenged the district judge's indirect-victim ruling. Nor has he presented any evidence of any injury to himself or to the class members.

So the district judge was right to dismiss the RICO claim—and the plaintiff has not appealed the dismissal. It's the defendants who have appealed, complaining—not about the dismissal of course, but about the denial of their motion for an award of their attorney's fees as a sanction for what they contend was a suit brought without "an inquiry reasonable under the circumstances" to determine that the suit was "not being presented for any improper purpose" and was not frivolous. Fed. R. Civ. P. 11(b)(1) and (2). We discussed the plaintiff's case at length only because it's the essential background to the defendants' motion.

The defendants have missed the boat—they have failed to engage the district judge's grounds for denying the motion. On whether the suit was frivolous or had been brought for an improper purpose, the judge said that the plaintiffs' theory (on which the suit pivoted, given RICO's requirement that the plaintiff show an injury to business or property) that PEs were property "was wrong … but I don't think it was so wrong as to be sanctionable … . Referring to PEs as property

… was part of the vernacular. The district's commissioners thought that PE was property … . PEs were apparently treated as though they could be bought and sold." And so the plaintiffs' suit, while meritless, was not frivolous. As for its having been brought for an "improper purpose," "certainly, it is not improper to file a non-frivolous claim in the hope of getting paid." *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003).

More troubling is the judge's ground for rejecting the defendants' argument that the plaintiffs had failed to conduct an adequate pre-complaint investigation, as required by Fed. R. Civ. P. 11(b)(3), (4). The plaintiff's complaint contained supplemental state law claims for fraud and conspiracy, claims that rested on the same facts as the main claim, the RICO claim. When the judge dismissed that claim, he relinquished supplemental jurisdiction over the state-law claims and remanded them to state court, where they are pending. Having done so he denied the Rule 11 motion on the ground that if he imposed sanctions for "objectively groundless factual allegations of fraud and lying and conspiracy and theft and it turns out that Mr. Fiala prevails in state court[,] I'd look kind of foolish for jumping the gun, and I'd be stepping on the toes of the state court judge, and I don't think it's appropriate to do that." That was not a sound reason for *denying* the defendants' motion, for no basis is suggested for a state court's having jurisdiction to impose sanctions for misconduct committed in a federal proceeding.

What the district judge should have done, given his uncertainty about the merits of the motion and his belief that the state court litigation might cast light on those merits, was to stay action on the motion pending findings in the state

case that might undermine or bolster it. That might seem inconsistent with Rule 11's focus on the pre-complaint investigation. But the question of the adequacy of that investigation (which we address next) is different from whether the suit was brought for an improper purpose, or was frivolous. Whether the factual allegations turn out to be true is relevant to that question. A complaint might be filed with no pre-complaint investigation whatsoever; but if the purpose was not improper and all the alleged facts turned out to be true and the plaintiff prevailed in the suit, there would be no basis for imposing sanctions. So the judge wasn't wrong to think that state court findings could affect the merits of the Rule 11 motion, and therefore he could have waited to rule on the motion, though he should not have denied it outright.

In the section of their brief that precedes the argument portion and is captioned "The District Court's Ruling," the defendants complain that "no determination whatsoever was made [by the district judge] as to whether [class counsel] performed a reasonable pre-filing inquiry." But that oblique complaint—that the judge should have made his own determination rather than dumping the issue on the state court—is neither elaborated, nor even mentioned, in the argument portion of the brief. Not until their reply brief do the defendants wake up and argue that the judge should have made his own determination regarding the reasonableness of the pre-complaint inquiry. There they point out that "the district court's ruling results in an automatic free pass under Rule 11 for any plaintiff clever or lucky enough to have coupled state law claims with [federal] claims." That's a good point, but comes too late; an argument first made in an appellant's reply brief is forfeited. *Georgou v. Fritzshall*, 178 F.3d 453, 456–57 (7th Cir. 1999); *EIMSKIP v. Atlantic Fish*

*Market, Inc.*, 417 F.3d 72, 78 (1st Cir. 2005); *United States v. Yousef*, 327 F.3d 56, 115–16 (2d Cir. 2003); 16AA Charles A. Wright et al., *Federal Practice & Procedure* § 3974.3, pp. 277–82 (4th ed. 2008).

But this bobble by the defendants turns out not to matter, because they have never made a persuasive case that the pre-complaint investigation had been inadequate. Class counsel claims without contradiction to have devoted 170 hours to factual and legal research before filing the suit. The fact that the research turned up negligible evidence of injury to class members does not imply an inadequate investigation, but merely a weak case. The builder Kobler *may* have been injured by having to fork over $150,000 to B&B to receive PE allotments that he needed in order to be able to obtain sewage permits, which he needed in order to be able to build salable houses in Fox Mill. He testified that of course the fees were costs to him and that he tries to recoup his entire costs in the price he charges for building a house, but he was unclear whether he always succeeds in recouping the fees. And though he agreed with the defendants' lawyer at a couple of places in his deposition that he had recouped them, it's unclear whether he understood the questions that elicited that response. If the fees were higher than what the sanitary district itself would have charged for permits, he may have been hurt—anything that increases a seller's costs is likely to reduce his profits. For the tendency of an increase in price is to reduce buyer demand, and the likelihood of such a reduction may cause a seller to trim his price at some sacrifice in profit to avoid losing customers. Kobler may have thought that he had recouped the PE fees that he had paid B&B but not some other cost. But maybe he hadn't been able to recoup the other cost because he he could not raise

his price sufficiently to cover both it and the PE fees; in that event any increase in those fees attributable to the alleged RICO violation would have hurt him, albeit indirectly.

The complaint also alleged that B&B's scheme "endanger[ed] the health and welfare of the plaintiffs and the citizens within the [sanitary district] and Illinois." For both the Illinois Environmental Protection Agency and the Illinois attorney general notified the Wasco Sanitary District that it was violating federal and state pollution regulations, and conceivably that was because the district had been denied by the plaintiffs' fraud the resources it needed to make its sewage system comply with those regulations. There's no evidence to support that conjecture, however, and even if there were it would establish merely a personal injury, which is not compensable under RICO. *Evans v. City of Chicago*, 434 F.3d 916, 926 (7th Cir. 2006); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918–19 (3d Cir. 1991); cf. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). Fiala presented no theory of injury to his or the class members' businesses or property stemming from the effect of the defendants' alleged conspiracy on the district's compliance with pollution regulations.

But all this is to one side of the alleged inadequacy of the pre-complaint investigation, which the defendants failed to substantiate.

The district judge's denial of the Rule 11 motion, though based in part on an erroneous (but harmlessly so) ground, must be

AFFIRMED.